**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DI MA, individually and on behalf of all others similarly situated, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| PATHEON N.V., DANIEL AGROSKIN, CHARLES COGUT, PAMELA DALEY, PHILIP EYKERMAN, HANS PETER HASLER, WILLIAM B. HAYES, PAUL S. LEVY, JEFFREY P. MCMULLEN, JAMES C. MULLEN, STEPHAN TANDA, GARY PISANO, HUGH WELSH, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

C.A. No. 17-cv-4979

**JURY TRIAL DEMANDED**

Plaintiff Di Ma ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.     Plaintiff brings this class action on behalf of the public stockholders of Patheon N.V. ("Patheon" or the "Company") against the members of Patheon's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(d)(4), 15 U.S.C. § 78n(d)(4), of the Securities and Exchange Act of 1934 (the "Exchange Act"), U.S. Securities and Exchange Commission (the "SEC") Rule 14d-9 promulgated thereunder, 17 C.F.R. § 240. 14d-9, and 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(e), 78t(a).  Specifically, Defendants solicit the tendering of stockholder shares in connection with the sale of the Company to Thermo Fisher Scientific Inc. ("Thermo Fisher") through Thermo Fisher's wholly-owned subsidiary, Thermo Fisher (CN) Luxembourg S.à.r.l. ("Purchaser"), through a recommendation statement that omits material facts necessary to make

the statements therein not false or misleading. Stockholders need this material information to decide whether to tender their shares.

2.     On May 15, 2017, the Patheon and Thermo Fisher issued a joint press release announcing that they had entered into a purchase agreement dated May 15, 2017 (the "Purchase Agreement"), by which Thermo Fisher and Purchaser would commence a tender offer (the "Tender Offer") to acquire all of the outstanding shares of Patheon common stock for $35.00 per share in cash (the "Offer Consideration,"). The Tender Offer, commenced on May 31, 2017, is set to expire on August 10, 2017. The transaction between Patheon and Thermo Fisher (the "Proposed Transaction") has an enterprise value of approximately $7.2 billion.

3.     In connection with the commencement of the Tender Offer, on May 31, 2017, the Company filed a recommendation statement on a Schedule 14D-9 (the "Recommendation Statement") with the SEC. The Recommendation Statement is materially deficient and misleading because, *inter alia*, it fails to disclose material information about the background of the Proposed Transaction. Without all material information, Patheon stockholders cannot make an informed decision regarding whether to tender their shares. The failure to adequately disclose such material information constitutes a violation of §§ 14(d)(4), 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding whether to tender their shares in connection with the Proposed Transaction .

4.     For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the close of the Tender Offer or, in the event the Tender Offer closes without supplemental disclosures being made, recover damages resulting from the Individual Defendants' violations of these laws. Judicial

intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

6.    The Court has Personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) Patheon's securities are listed and traded on the New York Stock Exchange; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

8.    Plaintiff is, and has been at all relevant times, the owner of shares of ordinary stock of Patheon.

9.    Patheon is a public limited liability company organized under the laws of The Netherlands with the trade register under file number 59564903.  It maintains principle executive

offices at Evert van de Beekstraat 104, 1118 CN, Amsterdam Schiphol, The Netherlands. Patheon's common stock trades on the New York Stock Exchange under the ticker symbol "PTHN." The Company maintains its U.S. headquarters at 4815 Emperor Blvd., Suite 300, Durham, NC 27703 and lists its Agent for Service as Eric Sherbert, General Counsel and Secretary, 111 Speen St., Suite 550, Framingham, Massachusetts 01701.

10.    Defendant Daniel Agroskin ("Agroskin") has served as a director of the Company since 2009.

11.    Defendant Charles Cogut ("Cogut") has served as a director of the Company since March 2017.

12.    Defendant Pamela Daley ("Daley") has served as a director of the Company since March 2016.

13.    Defendant Phillip Eykerman ("Eykerman") has served as a director of the Company since March 2014.

14.    Defendant Hans Peter Hasler ("Hasler") has served as a director of the Company since March 2016.

15.    Defendant William B. Hayes ("Hayes") has served as a director of the Company since March 2016.

16.    Defendant Paul S. Levy ("Levy") served as a director of the Company from 2007 to 2014 and has served as chairman of the Board since March 2016.

17.    Defendant Jeffery P. McMullen ("McMullen") has served as a director of the Company since March 2016.

18.    Defendant James C. Mullen ("Mullen") has served as Chief Executive Officer ("CEO") and a director of the Company since February 2011.

19.    Defendant Gary P. Pisano ("Pisano") has served as a director of the Company since March 2016.

20.    Defendant Stephan B. Tanda ("Tanda") has served as a director of the Company since March 2016.

21.    Defendant Hugh C. Welsh ("Welsh") has served as a director of the Company since March 2014.

22.    Defendants Agroskin, Cogut, Daley, Eykerman, Hasler, Hayes, Levy, McMullen, Mullen, Tanda, Pisano, and Welsh are collectively referred to as "Individual Defendants" and/or the "Board."

23.    Relevant non-party Purchaser is a private limited liability company organized under the laws of the Grand Duchy of Luxembourg and is a wholly owned subsidiary of Thermo Fisher. Its principle executive offices are located at 8-10 Avenue de la Gare, L-1610 Luxembourg, Grand Duchy of Luxembourg.

24.    Relevant non-party Thermo Fisher is a corporation organized and existing under the laws of the State of Delaware.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action individually and as a class action on behalf of all holders of Patheon common stock who are being, and will be, harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

26.    The action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

27.    The Class is so numerous that joinder of all members is impracticable.  According to the Recommendation Statement, as of May 30, 2017, Patheon had 145,136,214 ordinary shares outstanding.  While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, the Plaintiff believes that there are thousands of members in this Class.  All members of the Class may be identified from records maintained by Patheon or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants recommended stockholders tender their shares pursuant to the Proposed Transaction through a materially false or misleading Recommendation Statement in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if the securities laws violations are not remedied before the expiration of the Tender Offer; and (iii) whether the Class is entitled to injunctive relief as a result of Defendants' wrongful conduct.

29.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

30.    Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

31.    The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

32.   Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

33.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

34.   Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of herself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background*

35.   Patheon provides supply chain management, development and pharmaceutical product manufacturing services to over 400 clients, including 18 of the 20 largest biotechnology companies.

36.   Thermo Fisher is a biotech and pharmaceutical product development and services company with revenues of $18 billion.

*The Sale Process*

37.   On December 2, 2016, Party A's financial advisor contacted Defendant Mullen indicating interest in acquiring Patheon.   After discussing this inquiry with the Board and the Company's counsel, Defendant Mullen informed Party A's financial advisor that Patheon did not wish to pursue a sale transaction and intended to focus on the Company's long-term growth.

38.    On January 4, 2017, Party A submitted an unsolicited non-binding proposal to acquire Patheon, with a price range of $34.00 to $37.00 per share in cash.  Defendant Mullen then informed the Board of Party A's proposal.

39.    On January 17, 2017, the Board held a special telephonic meeting with Patheon's executive management team ("Company Management") where Defendant Mullen discussed his conversations with Party A's financial advisor and described the terms of the proposal received on January 4, 2017.  After reviewing the offer and considering the long-term business plans of the Company, the Board reaffirmed its decision to not pursue a transaction with Party A and instead focus on Patheon's long-term growth.  Following this meeting, the Company sent a letter to Party A's financial advisor and Defendant Mullen called the financial advisor to relay Patheon's decision not to pursue a transaction at that time.

40.    On February 7, 2017, Party A sent a letter to Defendant Mullen withdrawing their proposal and requesting they be informed if Patheon determined to pursue alternative strategic transactions in the future.

41.    On February 28, 2017, Marc Casper ("Casper"), President and CEO of Thermo Fisher, met with Defendant Mullen for dinner where they discussed the general operations of their respective businesses.  Defendant Mullen was told by Casper that Thermo Fisher was interested in acquiring Patheon and that Defendant Mullen should expect a preliminary non-binding acquisition proposal in the near future.   After this discussion, Defendant Mullen communicated the substance of this conversation to Defendant Levy.

42.    On March 7, 2017, at a regularly scheduled meeting of the Board without Company Management in attendance, the Board discussed the conversation between Defendant Mullen and Casper.   The Board determined to direct Company Management to engage in limited

discussions with Casper and Thermo Fisher's management with an objective of assisting Thermo Fisher with submitting a proposal that could be evaluated by the Board.

43.    On March 10, 2017, Defendant Mullen relayed the Board's views to Casper and discussed information that was necessary for Thermo Fisher to submit a preliminary proposal. Casper then agreed to send Defendant Mullen a draft non-disclosure agreement with a list of information requests for initial due diligence efforts.

44.    On March 14, 2017, Defendant Mullen informed the Board of the Conversation with Casper on March 10, 2017 and discussed Thermo Fisher's due diligence requests. Thermo Fisher and Patheon then executed a nondisclosure agreement on the same day.

45.    On March 16, 2017, the Company announced its preliminary unaudited financial results for the fiscal quarter ended January 31, 2017. These results were lower than expected and the Company lowered its guidance for the second quarter and the full year.

46.    On March 22, 2017, Defendant Mullen, Michel Lagard, Patheon's President and Chief Operating Officer ("COO"), Stuart Grant, Patheon's Chief Financial Officer ("CFO"), and Defendant Agroskin, met with Casper and other members of Thermo Fisher's management to address certain topics requested by Thermo Fisher, provide an overview of Patheon's business and industry, and discuss potential benefits of a transaction between Patheon and Thermo Fisher.

47.    On March 24, 2017, Patheon received a preliminary non-binding offer to acquire the Company from Thermo Fisher at a price of $33.00 per share in cash. This offer was subject to Patheon entering into an exclusivity agreement requiring the Company to negotiate exclusively with Thermo Fisher for a period of at least 30 days.

48.    On March 27, 2017, the Board held a special telephonic meeting with Company Management present. Defendant Mullen updated the Board on discussions with Thermo Fisher's

management team.  At this meeting the Board determined to retain Morgan Stanley as its financial advisor, Skadden as its U.S. counsel ("Company Counsel") and De Brauw as its Dutch counsel, to represent Patheon and assist with evaluating and negotiating acquisition proposals.

49.    On March 30, 2017, the Board held a special telephonic meeting where it reviewed the status of the Company's business, acquisition opportunities, and investor reactions to the first quarter earnings release.  Defendant Mullen and Defendant Agroskin advised the Board of the March 22, 2017 meeting with Thermo Fisher as well as the March 24, 2017 proposal from Thermo Fisher.  At this meeting, the Board consulted with Company Counsel on the merits of Thermo Fisher's proposal.  In addition, Morgan Stanley reviewed the terms of the proposal.

50.    At the same meeting on March 30, 2017, the Board also compared Thermo Fisher's offer to the previous inquiry made by Party A, considered potential alternative transactions with Party A, considered remaining a standalone public company, and considered whether other third parties would be interested or capable of acquiring the Company in the near term.  After these considerations, the Board directed Defendant Mullen to inform Casper that Thermo Fisher's proposal was not compelling and was below the range recently offered by a third party, but that the Company would be willing to engage further at a higher price point.  The Board also considered and declined Thermo Fisher's request for exclusivity and determined to contact Party A to gauge their continued interest.

51.    On March 31, 2017, Defendant Mullen relayed the Board's decision to Casper and suggested Thermo Fisher submit a proposal with a higher valuation.  On the same day, Defendant Agroskin contacted Party A's financial advisor to discuss whether Party A was still interested in acquiring the Company.  Party A's financial advisor indicated that Party A was still interested

and Defendant Agroskin informed the financial advisor that Party A would be given limited due diligence information in order to submit an updated proposal.

52.    On April 3, 2017, Patheon received a revised, non-binding proposal from Thermo Fisher to acquire the Company for $33.00 to $36.00 per share in cash.  This revised proposal also included a requirement that the Company enter into an exclusivity agreement requiring the Company to negotiate exclusively with Thermo Fisher for at least 30 days.

53.    On April 6, 2017, the Board held a special telephonic meeting (the "April 6th Board Meeting") to discuss Thermo Fisher's revised proposal and the status of discussions with Party A.  The Board discussed the adequacy of the revised Thermo Fisher proposal.  The Board concluded that the low end of Thermo Fisher's revised proposal was inadequate, and directed Company management and Morgan Stanley to provide due diligence access to Thermo Fisher, conditioned on Thermo Fisher's understanding that the Board expected a final bid at or above the high-end of the price range in Thermo Fisher's revised proposal.  The Board also determined not to enter into the exclusivity agreement with Thermo Fisher at that particular time.

54.    At the April 6th Board Meeting, the Board also considered the likelihood of Party A submitting a meaningful and actionable proposal on a timely basis and instructed Company Management and Morgan Stanley to provide Party A with due diligence access, conditioned on Party A executing a non-disclosure agreement.

55.    At the April 6th Board Meeting, the Board, Company management, and Morgan Stanley also discussed other potential third party acquirers, and after considering the limited number of third parties that would have the strategic and financial capacity to effect an acquisition of Patheon, the Board directed Morgan Stanley to contact Party B in order to gauge their interest in a strategic transaction with the Company.

56.   At the April 6th Board Meeting, the Board also formed a transaction committee, which consisted of Defendant Mullen, Defendant Agroskin, Defendant Eykerman and Defendant Cogut (the "Transaction Committee").  The Transaction Committee was given the authority to continue discussions with Thermo Fisher, Party A, and Party B (if they expressed interest); negotiate the terms and conditions of any offer or interest by third parties on behalf of the Company; and was directed to periodically report back the status of these discussions and negotiations to the Board.

57.   On April 6, 2017, Defendant Mullen relayed the determination of the Board to provide due diligence access to Thermo Fisher on the condition that the final proposal would have a price at or above the high end of the revised proposal's range and that the Company would not be entering into an exclusivity agreement.  On the same day, Morgan Stanley contacted party A's financial advisors to inform them that the Company would be providing due diligence access to Party A so they would be able to submit a revised acquisition proposal, after Party A executed a non-disclosure agreement.

58.   On April 7, 2017, at the Board's direction, Morgan Stanley contacted Party B to gauge their interest in an acquisition of Patheon.

59.   On April 7, 2017, Casper informed Defendant Mullen that Thermo Fisher was concerned their bid would be used to increase bids from other potential bidders and that it was willing to proceed without an exclusivity agreement with the Company so long as their bid was not used to gain other proposals from third parties and that news of their proposal did not leak.

60.   On April 10, 2017, Patheon and Party A executed a non-disclosure agreement with a standstill provision prohibiting Party A from acquiring shares, initiating any shareholder proposal to influence management or control of Patheon, or entering into an agreement with any

other party to do such.  This standstill provision expired upon announcement of the Proposed Transaction.

61.    From April 10, 2017 through May 9, 2017, Party A and Thermo Fisher conducted extensive due diligence investigations of the Company.

62.    On April 14, 2017, the Transaction Committee, Company Management, Morgan Stanley, and Company Counsel held a telephonic meeting.  Morgan Stanley provided an update on Thermo Fisher's and Party A's due diligence and informed the Transaction Committee that Party B was not interested in pursuing an acquisition of Patheon.

63.    On April 19, 2017, the Company received a non-binding proposal to acquire the Company from Party A for $36.00 to $38.00 per share in cash.

64.    On April 20, 2017, the Transaction Committee, Company Management, Morgan Stanley, and Company Counsel held a telephonic meeting.  The Transaction Committee discussed Party A's revised proposal and they determined to send draft purchase agreements to both Party A and Thermo Fisher on or around April 30, 2017, with markups due back on May 5, 2017, and to have the final proposals due on May 9, 2017.  The Transaction Committee determined that a Board meeting should be held on May 10, 2017 and instructed Morgan Stanley to communicate the proposed timeline to both Party A and Thermo Fisher.

65.    On April 26, 2017, the Board held a special telephonic meeting where they received an update from the Transaction Committee and scheduled a meeting of the Board for May 10, 2017.

66.    On April 27, 2017, at the direction of the Board, Morgan Stanley outlined the timeline to Party A and Thermo Fisher and on or about April 30, 2017, distributed to each a draft purchase agreement.

67.    On May 3 and May 5, 2017, Thermo Fisher and Party A requested that JLL Patheon Co-Investment Fund, L.P. ("JLL") and JLL Partners, Koninklijke DSM N.V. ("DSM") affiliates, provide tender and support agreements ("Support Agreements"), agreeing to, among other things, tender their respective shares and vote against any alternative acquisition proposal.

68.    On May 5, 2017, Thermo Fisher's legal counsel and Party A's legal counsel submitted revised draft purchase agreements to the Company's counsel.

69.    On May 8, 2017, the Transaction Committee, Company Management, Morgan Stanley, and Company Counsel held a telephonic meeting where Defendant Mullen provided an update on due diligence progress and discussions with Party A and Thermo Fisher and the Transaction Committee instructed Company Counsel to discuss their concerns with Party A's and Thermo Fisher's mark ups of the draft purchase agreements with Party A's and Thermo Fisher's respective legal counsels.

70.    On May 9, 2017, the Company received a revised proposal from Thermo Fisher to acquire Patheon at a price of $34.00 per share in cash.  This proposal had a stated expiration date of May 11, 2017.

71.    On May 10, 2017, the Company received a draft Commitment letter from Party A's lender and later that morning Party A's financial advisor informed Morgan Stanley that Party A would be unable to submit a final proposal until May 16, 2017.  However, Party A's financial advisor also informed Morgan Stanley that Party A was confident their proposal would be at a price above the price range in Party A's April 19, 2017 proposal ($36.00 to $38.00).

72.    On May 10, 2017, in the afternoon, the Board held a special in person meeting, attended by Company Management, Company Counsel, and Morgan Stanley.  At the direction of the Board, Morgan Stanley described the status of the potential transactions with Party A and

Thermo Fisher to date and Morgan Stanley's discussions with Party A's and Thermo Fisher's respective financial advisors. The Board then discussed Thermo Fisher's failure to submit an offer at the top end of its range and the likelihood that Party A would submit a final proposal on the timeline Party A's financial advisor had indicated. The Board also considered the fact that Casper was an active participant in the negotiations, and how in contrast, Party A's executives had not had any direct contact with Defendant Mullen. The Board then excused Company Management and their advisors and commenced an executive session to further discuss how to proceed.

73.    Following the executive session on May 10, 2017, the Board instructed Company Management to conduct additional financial analysis and present such at a special meeting which would be held on May 17, 2017. The Board then instructed Morgan Stanley to contact Thermo Fisher's financial advisor and indicate that the Company would consider Thermo Fisher's May 9, 2017 proposal at the May 17, 2017 meeting. The Board also directed Morgan Stanley to contact Party A's financial advisor to both request a direct conversation occur between Defendant Mullen and Party A's CEO and inform Party A they should submit a final proposal as soon as possible, which Morgan Stanley did later that day.

74.    On the morning of May 12, 2017, Party A's financial advisor informed Morgan Stanley that they were unable to arrange a conversation between Defendant Mullen and Party A's CEO, that Party A would not be able to submit an acquisition proposal in the near future, and that it was unlikely that Party A would be able to submit a proposal in the future.

75.    On the same morning of May 12, 2017, Casper informed Defendant Mullen that Thermo Fisher would be willing to offer up to $35.00 per share in cash, if they could negotiate and execute the transaction prior to the U.S. stock markets opening on May 15, 2017. Casper

indicated that Thermo Fisher may be delayed or may not move forward at all if they could not come to an agreement on or before May 15, 2017, because Thermo Fisher wanted to announce the transaction in sufficient advance of its investor day on May 17, 2017.

76.   Throughout the day on May 12, 2017, the Transaction Committee, Company Management, Morgan Stanley, and Company Counsel held a number of telephonic meetings. Defendant Mullen described his conversation with Casper and Company Counsel discussed the remaining material issues with Thermo Fisher's proposal, which included the exclusivity restriction and the minimum tender condition threshold.  After this discussion, the Transaction Committee instructed Morgan Stanley to contact Thermo Fisher's financial advisor and inform them that the Company might consider a transaction with a $35.50 price per share in cash.  The Transaction Committee also instructed Company Counsel to resolve remaining material issues in the draft purchase agreement with Thermo Fisher's counsel and finalize relevant transaction documents.

77.   On the afternoon of May 12, 2017, Company counsel informed the Transaction Committee that Thermo Fisher was unwilling to allow Patheon to terminate the purchase agreement to accept a superior proposal.  In addition, Morgan Stanley informed the Transaction Committee that Thermo Fisher was unwilling to increase the price above $35.00 per share.  The Transaction Committee then decided to recommend the Thermo Fisher offer at $35.00 per share to the Board, contingent on any remaining material issues being resolved.

78.   On the morning of May 13, 2017, the Board, Company Management, Morgan Stanley, and Company Counsel held a telephonic meeting and the Board was updated on the sale process.

79.    Throughout the day on May 14, 2017, Company counsel continued to negotiate the remaining issues with Thermo Fisher's counsel and Morgan Stanley issued it fairness opinion with respect to the Proposed Transaction.  After negotiations with Thermo Fisher's counsel, it was determined that Patheon could terminate the purchase agreement if they received a superior offer, but the Company would have to pay a termination fee and Thermo Fisher had a right to preempt such termination by making an irrevocable written election to purchase all shares covered under the Support Agreements at $35.00 per share in cash within 30 days following the termination of the purchase agreement.  After these discussions on May 14, 2017, the Board unanimously approved the terms and conditions of the Purchase Agreement and determined to recommend acceptance of the offer by Patheon stockholders.  After this meeting, the Purchase Agreement was finalized.

80.    The next morning, on May 15, 2017, prior to the opening of the U.S. trading markets, the Purchase Agreement was executed by Thermo Fisher, Purchaser and Patheon.  In addition, affiliates of JLL and DSM executed the Support Agreements and  Patheon and Thermo Fisher issued a joint press release, reading in relevant part:

> Thermo Fisher Scientific Inc. (NYSE: TMO), the world leader in serving science, and Patheon N.V. (NYSE: PTHN), a leading global provider of high-quality drug development and delivery solutions to the pharmaceutical and biopharma sectors, today announced that their boards of directors have approved Thermo Fisher's acquisition of Patheon. Thermo Fisher will commence a tender offer to acquire all of the issued and outstanding shares of Patheon for $35.00 per share in cash. The transaction represents a purchase price of approximately $7.2 billion, which includes the assumption of approximately $2.0 billion of net debt.
>
> Patheon provides comprehensive, integrated and highly customizable solutions as well as the expertise to help biopharmaceutical companies of all sizes satisfy complex development and manufacturing needs. It is a leader in the high-growth, $40 billion CDMO market, which is fueled by growing customer demand for end-to-end solutions, flexible and scalable capacity, and regulatory expertise. Patheon has an extensive network of state-of-the-art facilities

primarily in North America and Europe, and approximately 9,000 professionals worldwide. The company generated 2016 revenue of approximately $1.9 billion and will become part of Thermo Fisher's Laboratory Products and Services Segment.

"Patheon's development and manufacturing capabilities are an excellent complement to our industry-leading offering for the biopharma market," said Marc N. Casper, president and chief executive officer of Thermo Fisher Scientific. "Our combined capabilities will enhance our unique value proposition for these customers, create significant value for our shareholders and further accelerate our company's growth."

James C. Mullen, chief executive officer of Patheon, said, "Over the past several years, we have increased our capabilities to become a leading CDMO provider in a highly fragmented market. We are confident that our combined offerings and Thermo Fisher's proven track record of disciplined M&A and successful integrations will take our business to the next level."

Casper added, "We look forward to welcoming our new colleagues from Patheon to Thermo Fisher. Patheon's commitment to quality and service excellence is directly aligned with our focus on helping our biopharma customers accelerate innovation and drive productivity."

### *The Recommendation Statement Misleads Patheon Stockholders by Omitting Material Information*

81.  On May 31, 2017, Patheon filed a materially misleading Recommendation Statement with the SEC which was designed to convince stockholders to tender their shares to Thermo Fisher.  The Recommendation Statement is rendered misleading by the omission of critical information concerning the process that led up to the execution of the Purchase Agreement, including the projected financial information provided to Morgan Stanley by Patheon management to support the rendering of its fairness opinion, Morgan Stanley's financial analysis conducted in reaching its fairness opinion, and information regarding potential conflicts of interest faced by Patheon senior management when leading the search for strategic alternatives that ultimately resulted in the execution of the Purchase Agreement.  As such, the Recommendation Statement, which recommends that the Company's stockholders tender their

shares in the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act.

### Potential Conflicts Facing Company Management and Directors

82.    The Recommendation Statement contains material misrepresentations and omissions regarding employment negotiations taking place in the lead up to the Purchase Agreement.

83.    The Recommendation Statement indicates that Thermo Fisher and Purchaser engaged with discussions with "certain executive officers of Patheon with respect to potential compensation arrangements to be effective following the Offering Closing, but no definitive agreements or arrangements" had been made as of the issuance of the date of the Recommendation Statement.

84.    Contrary to the disclosure in the Recommendation Statement, the continuing on of Patheon management after the close of the Proposed Transaction appears to be a foregone conclusion.  In the press release announcing the Proposed Transaction, Casper, Thermo Fisher's CEO, stated: "[w]e look forward to welcoming our new colleagues from Patheon to Thermo Fisher."

85.    Despite this public statement by Thermo Fisher, the Recommendation Statement is entirely silent regarding when discussions regarding the continuing role of Patheon management began.  Additionally, the Recommendation Statement fails to disclose which "certain executive officers" had discussions with Thermo Fisher regarding employment post-acquisition.

86.    This information is particularly material with respect to Defendant Mullen, as he was instrumentally involved in the negotiations with Thermo Fisher throughout the sale process which may be evidenced by his frequent contact and communications with Casper, his role as

CEO, and role as one of only four Board members who were on the Transaction Committee. Were specific discussions with Thermo Fisher to have occurred regarding Defendant Mullen's, or any other Patheon officers, directors, or employees during the sales process, the disclosure of potential conflicts would be material to a stockholder's decision as to whether or not to tender their shares, especially considering Party A indicated it would offer a higher price than that offered by Thermo Fisher.

87.    Thus, the Recommendation Statement materially misleads Patheon stockholders by omitting material facts concerning the timing and nature of communications between Thermo Fisher and the Board or any Patheon senior management regarding post-transaction retention of Patheon's management and/or directors.  Patheon stockholders are currently led to believe that the sales process was free from conflicts of interest, and that no negotiations regarding management retention occurred.

88.    Statements that "no definitive agreements or arrangements" had been made are rendered materially misleading by the omission of material facts regarding the timing and nature of employment communications.

### *Morgan Stanley's Financial Analysis*

89.    The Recommendation Statement describes Morgan Stanley's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Morgan Stanley's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Patheon's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Morgan Stanley's fairness opinion in determining whether or not to tender their shares.  This omitted information, if disclosed, would significantly alter the

total mix of information available to Patheon's stockholders.

90.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the range of Patheon's terminal values; (ii) Patheon's unlevered free cash flows as calculated by Morgan Stanley for the Company; (iii) the inputs used and assumptions made in deriving the range of discount rates of 7.7% to 8.9%; (iv) Morgan Stanley's basis for using a perpetual growth rate of 2.5% to 3.5%; and (v) no information as to why Morgan Stanley performed a sensitivity analysis nor reasoning as to any of the underlying assumptions or inputs used in such analysis.

91.    With respect to Morgan Stanley's *Discounted Equity Value Analysis*, the Recommendation Statement fails to disclose: (i) the inputs used and assumptions made in deriving the range of discount rates of 9.8% to 11.7%; (ii) Patheon's next twelve months of EBITDA as of October 31, 2018; and (iii) Patheon's projected net debt as of October 31, 2018.

92.    With respect to Morgan Stanley's *Precedent Transactions Analysis*, the Recommendation Statement fails to disclose the individual multiples for each of the selected comparable transactions.  The disclosure of such multiples is necessary because they are a crucial element of these analyses, as the analysis is based on comparison and relative valuation.  Without such disclosure, stockholders are unable to determine whether the range of multiples selected by Morgan Stanley reflects appropriately comparable transaction to the Proposed Transaction. Failure to disclose this information renders the statements in Recommendation Statement made by Morgan Stanley pertaining to the fairness of the Proposed Transaction misleading.

93.    With respect to Morgan Stanley's *Precedent Premia Analysis*, the Recommendation Statement fails to disclose premia nor the high, low, mean, and median premia for the transactions chosen for analysis.

94.    With respect to potential conflicts of interest faced by Morgan Stanley, the Recommendation Statement fails to disclose that, according to Bloomberg, Morgan Stanley currently holds 4,664,882 shares of Thermo Fisher's common stock.  Such information would be material to stockholders when determining how much credibility, if any, Morgan Stanley's fairness opinion should be afforded.

***Misleading Statements and Omissions Regarding the Company's Financial Projections***

95.    The Recommendation Statement fails to disclose material information concerning the Company's financial projections relied upon by Morgan Stanley in preparing its fairness opinion.

96.    The Recommendation Statement discloses two non-GAAP accounting metrics for projected financial information over the years 2017-2021: Adjusted EBITDA and Unlevered Free Cash Flow.  However, providing these non-GAAP metrics without reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.  Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.

97.    The Proxy also fails to disclose the following Company projections for the years 2017E to 2021E: (i) net income; (ii) earnings before interest expense; (iii) earnings per share; (iv) income taxes (if different from "cash taxes"); (v) interest expense; (vi) depreciation and amortization; (vii) stock based compensation; (viii) amortization of intangibles; (ix) other non-recurring items used to calculate Adjusted EBITDA; and (x) unlevered net operating profit after tax used in calculating Unlevered Free Cash Flow. Without these measures, cherry-picking the disclosed projections materially misleads Patheon stockholders and renders Morgan Stanley's

financial analysis materially incomplete and misleading.

98.    Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information pursuant to Regulation G. 17 C.F.R. § 244.100.

99.    Indeed, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  In fact, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial metrics that demonstrate the SEC is indeed tightening policy.[2]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

100.    Thus, the above-referenced line-item projections that have been omitted from the Recommendation Statement are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

101.    Defendants' failure to provide Patheon's stockholders with the foregoing material information renders the financial projections and analyses depicted in the Recommendation

---

[1]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[2]    *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, SEC (May 17, 2016), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

Statement materially incomplete and misleading, and constitutes a violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act, and Rule 14d-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information, and yet omitted at least recklessly or negligently.  The material information described above that was omitted from the Recommendation Statement takes on actual significance in the minds of Patheon's stockholders in reaching their decision whether to tender their shares in favor of the Proposed Transaction. Absent disclosure of this material information prior to expiration of the Tender Officer, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to tender their shares, and are thus threatened with irreparable harm for which damages are not an adequate remedy.

102.  Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**Claims Against All Defendants for Violations of § 14(e) of the
Securities Exchange Act of 1934**

103.  Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

104.  Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. § 78n(e).

105.  As discussed above, Patheon filed and delivered the Recommendation Statement to its stockholders, which defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

24

106. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the tender offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107. The Recommendation Statement was prepared, reviewed and/or disseminated by defendants. It misrepresented and/or omitted material facts, including material information about the intrinsic value of the Company and potential conflicts of interest faced by certain Individual Defendants.

108. In so doing, defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of § 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

109. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

110. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements

therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

111. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT II

### Claims Against All Defendants for Violations of § 14(d)(4) of the Securities Exchange Act of 1934 and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)

112. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

113. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

114. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

115. The Recommendation Statement violates § 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which render the Recommendation Statement false and/or misleading.

116. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with

approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

117. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

### COUNT III

**Claim for Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

118. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

119. The Individual Defendants acted as controlling persons of Patheon within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Patheon and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

120. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

121. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Recommendation Statement.

122.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

123.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) of the 1934 Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representative and her counsel as Class counsel;

(B)     declaring that the Recommendation Statement is materially false or misleading;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated:  June 30, 2017                    By:   /s/ *Christopher J. Kupka*
                                         Christopher J. Kupka (CK-9010)
                                         **LEVI & KORSINSKY, LLP**
                                         30 Broad Street, 24th Floor
                                         New York, NY 10004
                                         Tel: (212) 363-7500
                                         Fax: (212) 363-7171
                                         Email: ckupka@zlk.com

                                         - and -

                                         Donald J. Enright (to be admitted *pro hac vice*)
                                         Elizabeth K. Tripodi (to be admitted *pro hac vice*)
                                         1101 30th Street, N.W., Suite 115
                                         Washington, DC 20007
                                         Tel: (202) 524-4290
                                         Fax: (202) 337-1567
                                         Email: denright@zlk.com
                                                 etripodi@zlk.com

                                         *Attorneys for Plaintiff*